The undersigned have reviewed the Award based upon the record of the proceedings before the Deputy Commissioner.
The appealing party has shown good grounds to reconsider the evidence. However, upon much detailed reconsideration of the evidence as a whole, the undersigned reach the same facts and conclusions as those reached by the Deputy Commissioner, with some minor technical modifications. The Full Commission, in their discretion, have determined that there are no good grounds in this case to receive further evidence or to rehear the parties or their representatives, as sufficient convincing evidence exists in the record to support their findings of fact, conclusions of law, and ultimate order.
*******************
Accordingly, the Full Commission find as fact and conclude as matters of law the following, which were entered into by the parties in an Industrial Commission Form 21 Agreement for Compensation for Disability, approved by the Industrial Commission on February 2, 1993, and an Industrial Commission Form 26, Supplemental Memorandum of Agreement as to Payment of Compensation, approved by the Industrial Commission on June 6, 1994, at the hearing and in a Pre-Trial Agreement, dated March 7, 1995, as
STIPULATIONS
1. At the time of the claimed injury, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. At the time of the claimed injury, the employer-employee relationship existed between defendant-employer and plaintiff.
3. At the time of the claimed injury, Guilford County Schools and the North Carolina Department of Instruction were self-insured for the purposes of workers' compensation insurance coverage.
4. The plaintiff's average weekly wage at the time of the claimed injury was $285.67 per week, resulting in a compensation rate of $190.46 per week.
5. Plaintiff, while employed by the Guilford County Schools, suffered an admittedly compensable injury by accident on or about October 13, 1992, resulting in a knee injury which required surgery on October 27, 1992, performed by Dr. Andrew Collins. Plaintiff was paid temporary total disability from October 20, 1992 through January 3, 1993. Plaintiff was rated with a 10% permanent partial disability to her knee, and was paid for that rating in a lump sum on June 16, 1994. Plaintiff contends that she suffered a disabling emotional disorder (post-traumatic stress disorder) as a direct result of the surgery for the knee injury.
6. The issue to be determined by the undersigned is whether the cause of plaintiff's current emotional disorder is work related.
7. The parties submitted medical records into evidence, including the records of Dr. Collins, Dr. Cooper, Dr. Guyer, Dr. Hickling, Dr. Roy, Duke University Medical Center, Moses Cone Hospital, Dr. Chu and Dr. Mills.
8. Also received into evidence upon the stipulation of the parties are the following:
 — Plaintiff's Exhibit 1, I.C. Form 22, dated October 28, 1992,
 — Plaintiff's Exhibit 2, I.C. Form 18, dated June 20, 1993,
 — Plaintiff's Exhibit 3, I.C. Form 19, dated October 21, 1992,
 — Plaintiff's Exhibit 4, I.C. Form 33, dated August 17, 1993,
 — Plaintiff's Exhibit 5, I.C. Form 33R, undated,
 — Plaintiff's Exhibit 6, I.C. Form 33R Amended, dated November 17, 1994,
— Defendant's Exhibit 1, Warrant for Arrest.
*******************
RULINGS ON EVIDENTIARY MATTERS
All objections raised during the depositions of Dr. Cooper, Dr. Guyer, Dr. Hickling and Kristy Loman are ruled upon in accordance with the law and the Opinion and Award rendered in this matter.
*******************
Based upon all of the competent, credible, and convincing evidence adduced at the hearing, the undersigned make the following additional
FINDINGS OF FACT
1. On October 13, 1992, plaintiff sustained an admittedly compensable injury by accident arising out of and in the course of her employment with defendant-employer when she was walking across the parking lot and stepped on a large piece of gravel and twisted her knee. This injury led to an arthroscopic partial medial meniscectomy performed on October 27, 1992.
2. Plaintiff is a 46 year old woman with a history of being sexually abused by one or more uncles, having her father commit suicide when she was approximately 6 or 8 years old and as a child living in an environment where alcohol was abused.
3. At the time of her compensable injury by accident, plaintiff was a 42 year old married woman who had an adolescent son and an adolescent daughter. Plaintiff's adolescent son was having serious behavior problems and was suffering from alcoholism. Plaintiff first saw Dr. Charles Grayson Guyer, II, a clinical psychologist, with her husband and son in 1989, due to her son's alcoholism problems and the ensuing problems in the family. Plaintiff first saw Dr. Guyer individually as a patient as early as February 2, 1991. Plaintiff perceived that her son was an alcoholic and that that was causing problems in the family. Plaintiff next saw Dr. Guyer on April 8, 1991 and at that time had started having recurrent problems with bulimic behavior, bingeing and purging. Plaintiff had suffered from bulimia in the past. This behavior was caused by plaintiff having just seen an uncle. At that time, the plaintiff had some memory of her molestation, but could not tell if it was reality or a dream. This indicated that there was some suppression and repression of the molestation going on in plaintiff's mind. In April, 1991, plaintiff suffered from dysthymia. At that point, Dr. Guyer was not attempting serious insight psychotherapy, but rather was trying to keep the plaintiff functioning and out of the hospital.
4. Dr. Guyer saw the plaintiff next on April 19, 1991 when she was suffering from post-traumatic stress disorder, dysthymia and major depression. Dr. Guyer again saw the plaintiff on April 30, 1991 and on May 9, 1991. During these sessions plaintiff maintained the same diagnosis and the doctor merely provided supportive therapy and tried to keep plaintiff's bulimia under control. Dr. Guyer did not see plaintiff again from March 9, 1991 until early January 1993, after plaintiff's compensable injury and the resulting surgery.
5. On October 27, 1992, plaintiff underwent arthroscopic knee surgery which was performed by Dr. Andrew Collins. During the course of the knee surgery, plaintiff's local anesthesia, a knee block, became ineffective. Plaintiff began to experience pain and had to be given supplemental anesthesia by way of a face mask.
6. On December 28, 1992, plaintiff's son physically assaulted her daughter, Kristy Loman. In the morning of December 28, plaintiff's son physically attacked his sister, Kristy Loman, and hit her in the face twice. He also chased her next door and shoved her against the refrigerator in her grandmother's home. Later in the day, plaintiff's son returned to plaintiff's house where Kristy was alone and while his friend restrained Kristy in the living room, searched through her belongings. Kristy called a family friend for assistance and left the situation with the help of the friend. Later, when plaintiff learned of these events, she and her daughter Kristy Loman obtained an arrest warrant for plaintiff's son for physically assaulting Kristy Loman.
7. At that time or sometime very soon thereafter, plaintiff became convinced, whether rightly or wrongly, that her son had sexually assaulted her daughter Kristy Loman. Whether or not plaintiff's daughter was in truth sexually molested by her son is immaterial. The only fact that has bearing on plaintiff's psychological state is whether or not plaintiff believed that her son had sexually molested her daughter. It is uncontroverted that plaintiff believed that her son had sexually molested her daughter.
8. Dr. Collins, plaintiff's orthopaedic surgeon, released plaintiff to return to work on January 4, 1993, and the plaintiff worked for three days, January 4, 5, and 6, 1993. During the very late evening hours of January 7, 1993, plaintiff's son attempted to enter the plaintiff's home, even though the house was locked, while the plaintiff and her daughter were in the residence alone. As a result, plaintiff called the police and her son was arrested on the warrant which arose out of the December 28, 1992 incident.
9. During the late evening/early morning hours of January 7-9, 1993, plaintiff was rushed to the emergency room of Moses H. Cone Hospital suffering from a panic attack. On January 8, 1992, after visiting the emergency room at Moses H. Cone Hospital, plaintiff was admitted to Charter Hospital where she was treated by Dr. Charles Guyer, her previously treating clinical psychologist and Dr. Armah Cooper, a psychiatrist. Plaintiff called Dr. Guyer prior to her admission to Charter and indicated that her family was in crisis, that she did not feel safe and that she had just learned that her son had molested her daughter.
10. Plaintiff's panic attack was brought on by her belief that her son had sexually molested her daughter and by his attempts to enter plaintiff's house forcefully. Plaintiff was admitted to Charter on January 8, 1993 suffering from panic disorder, post-traumatic stress disorder and major depression. Plaintiff remained in Charter until she was discharged on January 29, 1993 suffering primarily from post-traumatic stress disorder, chronic severe and also suffering from panic disorder and major depression.
11. Dr. Guyer next saw the plaintiff on February 4, 1993, very shortly after her discharge from Charter. Plaintiff was again suffering from bulimia, post-traumatic stress disorder, major depression and dysthymia, a long standing depression. On this office visit she primarily discussed whether or not to pursue the warrant against her alcoholic son.
12. Plaintiff was re-admitted to Charter on February 18, 1993 suffering from psychosis, as well as post-traumatic stress disorder, chronic severe. At the time plaintiff presented to the hospital, she was disoriented and delusional. When plaintiff was released, she was primarily suffering from post-traumatic stress disorder, but also was suffering from brief reactive psychosis in remission and major depression in remission. Upon her admission on February 18, the plaintiff indicated that a return visit scheduled to her orthopaedic surgeon had provoked the psychosis in addition to being stressed out by her daughter's illness.
13. After plaintiff's discharge from her second admission, she again saw Dr. Guyer and indicated that she had decided to drop the charges against her son and felt like some of the things at home had made her have to go back into the hospital. Dr. Guyer also saw the plaintiff on March 19, 1993, March 23, 1993, March 30, 1993, April 6, 1993, April 20, 1993, April 30, 1993, May 4, 1993, May 7, 1993, May 20, 1993, May 25, 1993 and June 2, 1993. Throughout that time, plaintiff continued to suffer from bulimia, post-traumatic stress syndrome, dysthymia and major depression.
14. Plaintiff was re-admitted to Charter on June 2, 1993 for her major depression with psychotic features, her panic disorder and her post-traumatic stress disorder. Plaintiff was discharged on June 8, 1993.
15. Again on April 18, 1995, plaintiff was admitted to Charter Hospital for her post-traumatic stress disorder and major depression with psychotic features. Plaintiff was released from Charter Hospital on April 27, 1995. Plaintiff also had additional periodic stays at Charter Hospital in July 1994, August 1994 and May 1995.
16. From January 8, 1993 through the date of the hearing, due to her chronic severe post-traumatic stress disorder and major depression, plaintiff has been completely and totally disabled and unable to earn wages which she was receiving on October 13, 1992 at the same or any other employment.
17. As early as April 19, 1991, plaintiff was suffering from post-traumatic stress disorder, dysthymia, major depression and bulimia.
18. While plaintiff's awakening during the arthroscopic surgery which she underwent as a direct result of her October 13, 1992 admittedly compensable injury by accident, her experiencing of pain and confusion, and the subsequent general anesthesia by mask might potentially cause plaintiff's pre-existing post-traumatic stress disorder to be aggravated or exacerbated, it did not. Any testimony to the contrary, expert or lay, is not accepted by the undersigned as credible or convincing in light of the evidence of record taken as a whole.
19. Plaintiff did not experience disabling symptoms associated with her post-traumatic stress disorder, major depression and psychosis until the events surrounding her taking out a warrant against her son for abuse of her daughter and her ensuing belief that her son had sexually molested her daughter. Plaintiff's disabling symptoms appeared on the very evening plaintiff's son had attempted to enter her house by force while only she and her daughter were present and was arrested pursuant to the prior warrant.
20. Plaintiff was not disabled from working, and indeed had returned to work and worked three days without symptoms of post-traumatic stress disorder or psychosis which would prevent her from working, until the incident of her alcoholic son attempting to enter her house by force and being arrested pursuant to a warrant which plaintiff had sworn against her son because of what plaintiff believed to be her son's physical and sexual abuse of her daughter.
21. While plaintiff is disabled due to her post-traumatic stress syndrome and major depression, plaintiff has failed to prove by the greater weight of the credible or convincing evidence that the post-traumatic stress syndrome and other psychological problems from which plaintiff suffers and which have disabled her from working since January 1993 resulted from her employment with defendant-employer or from her injury by accident of October 13, 1992.
22. Prior to January 8, 1993, plaintiff had exhibited no psychotic behavior and while having pre-existing psychological problems involving severe neurosis, fears, anxiety, bulimia and post-traumatic stress disorder, was not disabled from working. Plaintiff's learning or believing she learned that her daughter had been molested sexually by her alcoholic son, an event similar to her own sexual abuse as a child, exaggerated, exacerbated and elevated her long standing problems to a level where she became psychotic and to a level at which she was unable to work due to her psychological problems.
*******************
The foregoing findings of fact and conclusions of law engender the following additional
CONCLUSIONS OF LAW
1. Plaintiff has failed to prove by the greater weight of the credible or convincing evidence that her disability caused by her psychological problems is a direct and proximate result of her admittedly compensable injury by accident arising out of and in the course of her employment with defendant-employer on October 13, 1992.
2. Plaintiff's claim for additional compensation based on her inability to work after January 7, 1993, therefore, is not compensable under the provisions of the North Carolina Workers' Compensation Act.
*******************
Based upon the foregoing findings of fact and conclusions of law, the undersigned enter the following
ORDER
1. Under the law, plaintiff's claim must be, and the same is, DENIED.
2. By order dated March 15, 1995, Dr. Cooper and Dr. Guyer were to be deposed at defendant's expense. Dr. Cooper was deposed on June 9, 1995 and Dr. Guyer was deposed on June 21, 1995. IT IS THEREFORE ORDERED that defendants shall pay an expert witness fee of $450.00 to Dr. Cooper and $180.00 to Dr. Guyer.
3. With the exception of the above-approved expert witness fees, each side shall bear its own cost.
This case is ORDERED REMOVED from the Full Commission docket.
This the __________ day of ___________________, 1997.
 S/ ______________________ J. HOWARD BUNN, JR. CHAIRMAN
CONCURRING:
S/ ______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
S/ ______________________ BERNADINE S. BALLANCE COMMISSIONER
JHB/kws